UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        Plaintiff,

v.                            CASE NUMBER: 1:19-cr-000239-RJD-1

WESLEY BLAKE BARBER,

        Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE

COMES NOW, the Defendant, Wesley Blake Barber, pursuant to 18 U.S.C. §3553(a), respectfully submits this Sentencing Memorandum in support of his request for this Honorable Court to exercise its discretion and impose a sentence below the advisory guideline range in the instant case.

At the time of filing, Counsel for the Defendant has submitted his corrections to errors and provided additional information regarding Mr. Barber's employment to his Presentence Report.

## 1.  Introduction

On September 14, 2021, Mr. Barber freely and voluntarily plead guilty to Count 5 of the Superseding Indictment, Violation of the Travel Act under 18 U.S.C. §1952(a)(3)(A) and 18 U.S.C. §371 before this Honorable Court. Mr. Barber, who has no criminal record, is facing an advisory sentencing guideline range of 46-57 months incarceration (total offense level 23, criminal history category I)[1]. (PSR ¶17)  Additionally, he faces up to three (3) years of Supervised Release.

---

[1] The current PSR shows the Guidelines Range to be at Level 21. As part of the signed plea agreement, Mr. Barber acknowledged the Government would be seeking Vulnerable Victim Enhancement.

By exercising their discretion to permit a downward variance, the Court would be providing a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing under 18 U.S.C. § 3553(a).[2] A sentence that includes a downward variance will satisfy the statutory goals of sentencing and will constitute a sentence that reasonably provides a just punishment, protects the public, promotes respect for the law, affords adequate deterrence and promotes rehabilitation as outlined in 18 U.S.C. §3553(a)(2). Based on the criteria set forth in § 3553, and its parsimony clause, Mr. Barber submits that a downward variance is the sole means of achieving a reasonable sentence. The 'reasonableness' of a sentence is, of course, determined by an individualized application of the § 3553 factors. *Gall v. U.S.*, 552 U.S. 38, 46 (2007).

This memorandum and the attached exhibits:

(1) addresses the factors set out in 18 U.S.C. § 3553(a)., which the Court must consider in determining the particular sentence to impose;

(2) sets out the reasons why the facts and circumstances of this specific case are unique to warranting a downward variance;

(3) incorporates character letters from friends, family, and colleagues who can speak to Mr. Barber's good character.

## **Booker and 18 U.S.C. §3553(a)**

The decision of the United States Supreme Court in *Booker* has rendered the United States Sentencing Guidelines "effectively advisory." *U.S. v. Booker*, 125 S. Ct. 738, 759-67 (2005). Pursuant to *Booker,* sentencing courts are required to consider a Defendant's guideline range, but may "tailor the sentence in light of other statutory concerns as well." *Id.* at 767 *(citing* 18 U.S.C. § 3553 (a)).

---

[2] See *Kimbrough v. United States*, 5522 U.S. 85.101 (2007)

As a result of *Booker* federal district courts must consider the seven factors set forth by

U.S.C. § 3553 (a) in determining a sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) [the applicable Sentencing Guidelines];
(5) any pertinent [Sentencing Guidelines] policy statement;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victim of the offense.

Moreover, § 3553(a) and the 'parsimony provision' mandate that the district court

"impose a sentence sufficient but not greater than necessary," to comply with the purposes of

sentencing set forth in § 3553(a)(2). Sufficiency of a sentence rather than excessiveness is echoed

in 18 U.S.C. § 3582, which recognizes that "imprisonment is not an appropriate means of

promoting correction and rehabilitation."

I.    **Nature and Circumstances of the Offense and  the History and Characteristics of Mr. Barber**

    **a. Nature and Circumstances**

Mr. Barber has long been a respected member of the legal and medical community whose

experience in mass tort litigation has existed for several years going back to his days working for

attorney Richard Hooper in Orlando, Florida. In 2013, Mr. Barber became involved in the

identification of potential clients for settlements in a consolidated Multi-District Litigation

stemming out of the Southern District of West Virginia. His extensive history in both the legal and medical communities made him a valuable asset for many law firms seeking to sign up clients related to this well documented settlement. Thus, Mr. Barber's main role in this case was to connect women who had been implanted with Transvaginal Mesh (TVM) with doctors and short term loans through the funding companies listed in the Superseding Indictment. In most circumstances, the situation happened by passing through several entities before it ultimately resolved.

Law firms, funding companies, and marketing companies advertised the TVM Multi District Litigation settlement on various mediums and would feature toll-free numbers or websites to allow potential clients to reach out. Once a potential client would reach out, the information was passed to another company who would reach to the potential client and ask questions about their implant to determine if they were actually a candidate for the settlement. If they were determined to be a candidate and wished to seek an additional medical evaluation, their information would be forwarded to Mr. Barber's entity, Surgical Assistance, who would then arrange for removal evaluation and/or surgery with doctors they had identified as being qualified to perform mesh removal and were currently performing such procedures. Surgical Assistance would also arrange for the travel, hotel, meals, and the same for one companion. Many times, these expenses were paid out of pocket by Surgical Assistance or Mr. Barber himself to assure travel was timely. Mr. Barber nor his entities attended any of these evaluations nor did he have any influence in the decision of the surgeon to perform the removal. That was ultimately up to the surgeons and their

support staff.

Mr. Barber's entities would also refer these clients to funding companies, which would advance money along covering the cost of surgery for removal. These contracts were strictly between the clients and the funding companies, however Mr. Barber through his entities would receive a referral fee.

It is Mr. Barber's contention that he never approved any high-pressure sales pitches, nor did he himself make any calls using such tactics, and once found out that such tactics were being used by other co-conspirators he stepped away from working with similar mass tort litigation settlements. Mr. Barber also would receive praise from patients who had long dealt with the complications caused by the defective TVM products.

On occasions, Mr. Barber accepted payments from doctors, including Dr. Walker, the Co-Defendant in this case. These payments were for reimbursement of the aforementioned expenses he or Surgical Assistance would front. This, in hindsight, was illegal under Florida Statutes §456.054(2) and (3)(a), and he admitted his guilt and expressed his remorse during his plea on September 14, 2021.

### b. The History and Characteristics of Mr. Barber

By all indications, Mr. Barber enjoyed a comfortable and supportive upbringing. He was the son of a Methodist minister, whose father was a well a respected member of the community. While his parents were strict, but they were also very supportive and loving, using the moral lessons of the Bible to teach Mr. Barber right from wrong. (PSR ¶41) His father passed in 2007

and his mother in 2018, but the lessons of his childhood are still a part of his day-to-day reflection.
*Id*.

Mr. Barber still maintains relationships with members of the Methodist community that impacted his upbringing so much. Throughout this process, they have been supportive of him, recognizing the role of forgiveness plays in the Christian religion.[3]

He has been married twice, and is the father to two children, and four step-children. (PSR ¶45-¶46) His first marriage was in 1999 to Marion Perez, together they had two children, Victoria and James. Victoria maintains a close relationship with her father living in suburban Detroit, and frequenting each other's residences.[4] James is only 15 years old and is still a minor whom Mr. Barber supports with monthly child support payments of $1,000 per month. (Id.). Mr. Barber and Ms. Perez separated in 2007 because of irreconcilable differences, but maintain a good relationship to this day.

In 2014, Mr. Barber married Ana Mansilla. When they met Ms. Mansilla was a single mother who was raising three of her children with no support from their father. Mr. Barber became a father figure for his stepchildren and supported them through their endeavors. While they separated in 2017, the stress and complications that came with these charges quashed any reconciliation they were attempting and, they divorced in 2020. (PSR ¶46-47) With COVID-19 hurting the job market, Ms. Mansilla was reduced to part-time labor relying on Mr. Barber to help her and her children. As a result, any incarceration would be a great detriment to her and her

---

[3] See Exhibit 4 (Letter from Pastor Philip Short)
[4] See Exhibit 4 (Letter from Victoria Barber)

family.[5]

After graduating the Christian high school, Westminster Academy, in Fort Lauderdale, Mr. Barber obtained his associates degree in paralegal studies from Tampa College. (PSR ¶54-55) Shortly after he began working for James Richard Hooper, a attorney in Orlando, Florida who focused his practice on product liability, workers' compensation, and securities litigation. It was at this firm that Mr. Barber first became familiar with mass tort claims. Mr. Barber worked very closely with Mr. Hooper in preparing products liability claims, and marketing targeted at potential victims to sign up as clients becoming a key figure in his practice. After Mr. Hooper's tragic passing in 2005[6], Mr. Barber used his experience to start consulting with medical offices and law firms assisting in creating their marketing plans and fulfilling staffing needs, this eventually led to Mr. Barber creating of MDJD Marketing & Consultants, Inc. This entity still exists, however the focus is directed to working with medical offices, surgical centers, and other clinics to help set up the staff and the back office to complete the day-to-day operations of these facilities. (Id. ¶56).

When the complications from defects in TVM started to appear and the eventual Multi-District Litigation was created in the District of West Virgina, many people looked to Mr. Barber's extensive contacts in the medical and legal communities as a way to help seek out potential clients for the lawsuit. Mr. Barber, along with another partner, later started and operated Medical Funding Consultants LLC and Surgical Assistance Inc. The businesses involved in these offenses, Surgical

---

[5] See Exhibit 4 (Letter from Ana C. Mansilla)
[6] Attorney-pilot killed in Winter Haven airplane accident – Orlando Sentinel – July 2, 2005
https://www.orlandosentinel.com/news/os-xpm-2005-07-02-crash02-story.html

Assistance, Inc and Medical Funding Consultants, LLC ceased operations in 2016 and officially dissolved in February of 2017.[7] Neither entity currently operates nor does it continue to derive any income.

Between the time of his presentence interview and the sentencing date Mr. Barber was hired as a marketing director for the Traumatic Brain Diagnostics of Michigan, LLC. That position compensates him at $3,800 per month. Mr. Barber's main employer, Dr. Stefan Pribil, MD has written a letter of support, and would continue to employ Mr. Barber ensuring him a stable work environment should the Court exercise their discretion to vary from the guidelines and place him on probation. [8]

Mr. Barber has been involved in his community over the years. Most recently, during the early months of COVID-19 he helped arrange events to provide COVID-19 testing to impoverished areas of Detroit, Michigan. These events started in April of 2020 and were critical, as testing was in very short supply, especially for low income families.

Mr. Barber suffers from several health issues. He was most recently diagnosed of Type-2 Diabetes, which requires the medication, Metformin, to lower his blood sugar levels. (PSR ¶50) Likewise, he has suffered from high blood pressure for several years, which requires Lisinopril. (Id.) In July, Mr. Barber was infected with COVID-19. The virus, paired with his underlying health conditions led to severe complications that dramatically lowered his oxygen saturation levels, caused severe difficulty in breathing, and caused severe complications with his kidneys. Given his

---

[7] See Exhibit A: Corporation Records
[8] See Exhibit D: Letter from Dr. Stefan Pribil

current health, Mr. Barber is at a severe risk of similar complications, or worse, should he get infected again with COVID-19. The American Civil Liberties Union (ACLU) has expressed concerns over the COVID-19 in our prisons, specifically the lack of social distancing and potential substandard healthcare services increasing risk to those who are infected within their population.[9]

### i. Criminal History

Mr. Barber has a criminal history score of zero. (PSR ¶36).Mr. Barber, at the age of 51, has never been charged with any offenses prior to this. Likewise, he's never been to prison or served a short jail sentence. A consideration for this Court to consider is the length of time in which he refrained from the commission of any crime as it "is a factor that is critical to a court's determination of a sentence it should impose." *United States v. Ward*, 814 F. Supp. 23, 24 (E.D.Va. 1993)

## II.     The Need for the Sentence Imposed

Section 3553(a)(2) lists the four purposes of sentencing, which can be summarized as just punishment, deterrence, protection of the public, and rehabilitation.

### a. Just Punishment

A downward variance sentence for a 51-year-old man, with no prior convictions, would satisfy the goals of sentencing. The advisory guidelines "do not require the judge to leave compassion and common sense at the door of the courtroom." *United States v. Johnson*, 964 F.

---

[9] *ACLU v BOP*, Case No 1:20cv3031 (D.D.C., filed Oct 21, 2020) - https://www.aclu.org/legal-document/aclu-v-bop-complaint

2d 124,125 (2nd Cir. 1992). In considering a "just punishment" for an offense, a sentencing court should also consider the additional penalties and hardships that will come with Mr. Barber's conviction. "There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court imposed sentences." *United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y 2016)

### b. Deterrence

Mr. Barber has long been a productive and beneficial member of society, and absolutely would remain as such if the Court exercises their discretion to depart from the guidelines.

███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████

### c. Protection of the Public

Here, the Court is faced with countervailing considerations. On the one hand, this Superseding Indictment alleges that Mr. Barber and his co-conspirators used the vulnerability of the victims paired with the belief of a large financial settlement to sign up their clients to their advantage. On the other hand, it is well documented that TVM is a very dangerous product and the likelihood of removal because of complications was potentially inevitable.

Over the last few years, the Food and Drug Administration (FDA) has levied several very harsh opinions on TVM the last several years. In 2019, the FDA banned TVM as a product for

---

pelvic organ prolapse.[11]

Mr. Barber recognizes and accepts that he had a severe lapse and ignorance in good judgment that was motivated by the belief that he was helping these women who were dealing with a very dangerous product. Mr. Barber's conduct, when considered in the broad spectrum of what is and what is not significant in the entire TVM Multi-District Lawsuit and settlement, should fall on the lower level of the scale.

Any argument that Mr. Barber is a danger to the community is also contradicted by his long history of not engaging in criminal activity

### d. Rehabilitation

Mr. Barber was the victim of a sexual assault at a young age. (PSR ¶44). It was a traumatic event that he sheltered for 44 years knowing that it would have caused immense heartbreak for his family. In or around 2013 or 2014 he did finally come out about the role it had in his life to a counselor. Mr. Barber would need to continue any mental health treatment that is available to him.

### III.     The Sentencing Guideline Calculations and Pertinent  Policy Statements of the Sentencing Guidelines.

The pre-sentence report ("PSR") has calculated Mr.  Barber's guidelines at a sentencing range of 37-46 months imprisonment (level 21), criminal history category I.  In order to arrive at level 21, the calculation of loss was set at over $1,500,000.  The Government asserts that the Vulnerable Victim Enhancement under United States Sentencing Guidelines Section §3A1.1(b)(1) should apply, bringing his level 23 and a range of 46-57 months. This calculation was stipulated to in the signed plea agreement.

---

[11] Exhibit C: FDA Timeline

### a. The Kinds of Sentences Available

As this Court is aware, this range is merely advisory, and is merely one factor that must be considered by the Court. █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

### b. Need to Avoid Unwarranted Sentence Disparities Among Defendants

Mr. Barber believes there are a number of unindicted co-defendants involved in this conspiracy with varying levels of culpability, some that are more significant than his own. ████

████████████████████████████████████ It is not known if there will be further indictments involving this conspiracy. The impact of the current status of those co-conspirators in relation to any sentence Mr. Barber may receive should absolutely be considered when this Honorable Court makes their decision on the appropriate sentence for Mr. Barber.

### c. The Need to Provide Restitution to Any Victim of the Offense

Any incarceration would only inhibit his ability to pay restitution in this case. There are three identified victims in the indictment, Jane Doe #1; Jane Doe #2, and Jane Doe #3. The amount of restitution is calculated as $86,000 to Jane Doe #1[12] and $153,615.00 to Jane Doe #2. Mr. Barber would pay all restitution as required by the Court.

### d. Additional Policy Statements

Variances are permitted when there are "circumstances of a kind not adequately taken into account" in the guidelines.  U.S.S.G. §5K2.O  One such circumstance, which is relevant to

---

[12] Jane Doe #1 is listed as Jane Doe #3 in the current PSR.

Mr. Barber, is:

> An extraordinary physical impairment may be a reason to depart downward; e.g. in the case of a seriously infirm defendant, home confinement might be equally efficient as and less costly that incarceration.

**U.S.S.G. Section §5H1.4**

As stated in previously, Mr. Barber's health is poor, and incarceration would only place him at further risk of further complications or, in the immediate timeframe, another COVID-19 infection.

## The Appropriate Sentence for Mr. Barber

Mr. Barber respectfully requests that, pursuant to U.S.S.G. §5F 1.2, the Court sentence him to probation, with home-confinement if deemed necessary, any continued counseling, any restitution, and substantial community service in lieu of incarceration in this cause.

For much of Mr. Barber's life he has lived as a lawful and hardworking person who is well respected among his peers. He has a great support in the form of family, friends, and employers who can attest to this.

Ultimately, Mr. Barber has shown remorse and accepted responsibility for his actions through this plea. Such a sentence would serve as an adequate deterrent to future criminal conduct, would 'promote respect for the law and provide just punishment for the offense' and would be "sufficient but not greater than necessary."

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 3rd day of January, 2022, I personally filed the foregoing, with the Clerk of the Court, and a copy by hand delivery to the following: Office of the United States Attorney, Elizabeth Geddes & Andrew Estes, 271 Cadman Plaza East, Brooklyn, NY 11201.

*/s/Joseph C. Flynn*
Joseph C. Flynn, Esquire
Florida Bar Number:47027
Attorney for the Defendant
NeJame Law
189 S. Orange Ave. Suite 1800
Orlando, Florida 32801
Phone: 407-500-0000
Email: trey@nejamelaw.com
Secondary
Email:Jessica@nejamelaw.com

EXHIBIT "A"

Corporation Records

DIVISION OF CORPORATIONS



Division of
CORPORATIONS
*an official State of Florida website*

Department of State  /  Division of Corporations  /  Search Records  /  Search by Entity Name  /

# Detail by Entity Name

Florida Limited Liability Company
MEDICAL FUNDING CONSULTANTS, LLC

### Filing Information

| | |
|---|---|
| **Document Number** | L11000080606 |
| **FEI/EIN Number** | 45-2903428 |
| **Date Filed** | 07/13/2011 |
| **Effective Date** | 07/15/2011 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 02/02/2017 |
| **Event Effective Date** | NONE |

### Principal Address

8815 CONROY WINDERMERE RD
SUITE 171
ORLANDO, FL 32835 FL

Changed: 03/20/2012

### Mailing Address

8815 CONROY WINDERMERE RD
SUITE 171
ORLANDO, FL 32835 FL

Changed: 03/20/2012

### Registered Agent Name & Address

BARBER, WESLEY B
8815 Conroy Windermere Rd #171
Orlando, FL 32835

Name Changed: 03/05/2015

Address Changed: 03/19/2014

**Authorized Person(s) Detail**

**Name & Address**

Title Member

BARBER, WESLEY B
8815 Conroy Windermere #171
Orlando, FL 32835

Title Member

RODRIGUEZ, IHAN
8815 CONROY WINDERMERE RD SUITE 171
ORLANDO, FL 32835

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2014 | 03/19/2014 |
| 2015 | 03/05/2015 |
| 2016 | 03/04/2016 |

**Document Images**

| | |
|---|---|
| 03/04/2016 -- ANNUAL REPORT | View image in PDF format |
| 03/05/2015 -- ANNUAL REPORT | View image in PDF format |
| 03/19/2014 -- ANNUAL REPORT | View image in PDF format |
| 02/13/2013 -- ANNUAL REPORT | View image in PDF format |
| 03/20/2012 -- ANNUAL REPORT | View image in PDF format |
| 07/13/2011 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Entity Name  /

# Detail by Entity Name

Florida Profit Corporation
SURGICAL ASSISTANCE, INC.

### Filing Information

| | |
|---|---|
| **Document Number** | P13000066191 |
| **FEI/EIN Number** | 46-4901774 |
| **Date Filed** | 08/08/2013 |
| **Effective Date** | 08/07/2013 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 02/02/2017 |
| **Event Effective Date** | NONE |

### Principal Address

8250 Exchange Drive
Suite 110
ORLANDO, FL 32809

Changed: 05/23/2014

### Mailing Address

8250 Exchange Drive
Suite 110
ORLANDO, FL 32809

Changed: 05/23/2014

### Registered Agent Name & Address

MDJD Marketing and Management Consultants, Inc
8815 Conroy Winderemere Road
Suite 171
ORLANDO, FL 32835

Name Changed: 08/28/2014

Address Changed: 08/28/2014

**Officer/Director Detail**

**Name & Address**

Title Director

Barber, Wesley B
8250 Exchange Drive
Suite 110
ORLANDO, FL 32809

Title Director

Rodriguez, Ihan
8250 Exchange Drive
Suite 110
ORLANDO, FL 32809

**Annual Reports**

| Report Year | Filed Date |
|-------------|------------|
| 2014 | 04/28/2014 |
| 2015 | 03/23/2015 |
| 2016 | 03/29/2016 |

**Document Images**

| | |
|---|---|
| 03/29/2016 -- ANNUAL REPORT | View image in PDF format |
| 03/23/2015 -- ANNUAL REPORT | View image in PDF format |
| 08/28/2014 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 05/23/2014 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 04/28/2014 -- ANNUAL REPORT | View image in PDF format |
| 08/08/2013 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

EXHIBIT "B"

Medical Records

BARBER, Wesley **DOB:** 04/07/1970 (51 yo M) **Acc No.** 116654

---

 **MICHIGAN**
**SPECIALTY CLINIC**

# Summary of Today's Visit
**Barber , Wesley DOB:04/07/1970**
**Account No 116654**
**Sex:Male**
**Race:White**
**Ethnicity:Declined to Specify**
**Preferred Language:English**
**09/08/2021 visit with Abdulhadi Sinan,**
**MD**

---

## Vitals

- Wt 265.8 (lbs)
- HR 105 (/min)
- BP 133/95 (mm Hg)
- Temp 96.8 (F)
- PulseOx 98

## Allergies

- N.K.D.A.

## Medication List

- Start metFORMIN HCl : 500 MG 1 tablet with a meal Orally twice a day,30 day(s) ,60 Tablet ,Refills: 1
- Refill Lisinopril : 20 MG 1 tablet Orally once a day,30 days ,30 Tablet ,Refills: 2

**Other medications you are on**
- Taking Lisinopril : 10 MG 1 tablet Orally once a day,30 day(s) ,30 ,Refills: 0
Notes:
given lancets/strips/glucometer device
Educated for diet and symptoms of hypoglycemic reaction.

## Other Medical Conditions (Problem List)

- I10    Essential (primary) hypertension
    **Modified On:** 09/08/2021
    **W/U Status:** confirmed
- E11.9 Type 2 diabetes mellitus without complications
    **Modified On:** 09/08/2021
    **W/U Status:** confirmed
- E66.9Obesity, unspecified
    **Modified On:** 09/08/2021
    **W/U Status:** confirmed

---

Summary of Today's Visit for - Barber , Wesley DOB:04/07/1970 Account No: 116654
**Michigan Specialty Clinic, PLLC (S)   13510 Michigan Ave   Dearborn, MI 48126-3583   313-438-0702**
*Summary generated by eClinicalWorks (www.eclinicalworks.com)*
*This document contains confidential information about your health. To maintain your privacy, do not throw this document in the trash. If
you do not wish to keep this document for your records, please shred or otherwise securely dispose of your copy. If you are not the
intended recipient, please destroy this document and report it to the physician's office named above.*

https://mimclcapp.eclinicalweb.com/mobiledoc/jsp/catalog/xml/printVisitSummary.jsp?enc...    9/8/2021

|  | 1<br>9/1/2021<br>00:01 |
|---|---|
| **CHEM PROFILE** | |
| Sodium | 136 |
| Potassium | 4.2 |
| Chloride | 101 |
| Carbon Dioxide (CO2) | 21 |
| Anion Gap | 14 |
| Blood Urea Nitroge... | 16 |
| Creatinine | 1.18 |
| GFR African American | 82 * |
| GFR Non African Am... | 71 * |
| Glucose | 383 * |
| Albumin | 4.1 |
| Globulin | 3.0 |
| Albumin/Globulin R... | 1.4 |
| Alkaline Phosphata... | 72 |
| Aspartate Aminotra... | 11 |
| Alanine Aminotrans... | 21 |
| Bilirubin Total | 0.4 |
| Calcium | 9.2 |
| Protein Total | 7.1 |
| **LIPID PROFILE** | |
| Cholesterol | 171 * |
| HDL Cholesterol | 26 |
| Cholesterol/HDL Ratio | 6.6 |

Barber, Wesley (MR#9450342) Printed by SINAN, ABDULHADI [PO9848]

| | 1<br>9/1/2021<br>00:01 |
|---|---|
| **DIABETES** | |
| Hb A1c | 8.4 * ▶ |
| Estimated Average … | 194 * |
| **PARATHYROID** | |
| Vit D-25 OH | 13 * ⁅. |
| **THYROID** | |
| TSH | 1.77 |
| **TUMOR/MALIGNANCY M….** | |
| PSA | 0.67 * |
| **GLUCOSES** | |
| Glucose | 383 * ▶ |

| | 1<br>9/1/2021<br>00:01 |
|---|---|
| Non-HDL Cholestero... | 145 * |
| LDL CHOLESTEROL | 95 * |
| Triglycerides | 250 * ▶ |
| **OTHER CHEMISTRY** | |
| Vitamin B12 | 673 * |
| **CBC** | |
| WBC | 10.6 ▶ |
| RBC | 5.60 ▶ |
| HEMOGLOBIN | 16.1 |
| Hematocrit | 47.8 |
| MCV | 85 |
| MCH | 29 |
| MCHC | 34 |
| RDW CV | 14 |
| PLATELET | 264 |
| Nucleated RBC | 0.0 |
| CBC W/ DIFF (OUTRE... | 🖼 ⁝ |
| **DIFFERENTIAL** | |
| Neutrophils | 4.4 |
| Lymphocytes | 3.9 |
| Monocytes | 0.8 |
| Eosinophils | 1.3 ▶ |
| Basophils | 0.2 ▶ |
| Immature Granulocytes | 0.05 ▶ |

EXHIBIT "C"

FDA Records

**FDA NEWS RELEASE**

# FDA takes action to protect women's health, orders manufacturers of surgical mesh intended for transvaginal repair of pelvic organ prolapse to stop selling all devices

**For Immediate Release:**

April 16, 2019

Español (/news-events/press-announcements/la-fda-actua-para-proteger-la-salud-de-las-mujeres-y-ordena-los-fabricantes-d

The U.S. Food and Drug Administration today ordered the manufacturers of all remaining surgical mesh products indicated for the transvaginal repair of pelvic organ prolapse (POP) to stop selling and distributing their products in the U.S. immediately. The order is the latest in a series of escalating safety actions related to protecting the health of the thousands of women each year who undergo surgery transvaginally to repair POP.

The FDA has determined that the manufacturers, Boston Scientific and Coloplast, have not demonstrated a reasonable assurance of safety and effectiveness for these devices, which is the premarket review standard that now applies to them since the agency reclassified them in class III (high risk) in 2016. As part of the 2016 reclassification, manufacturers were required to submit and obtain approval of premarket approval (PMA) applications, the agency's most stringent device review pathway, in order to continue marketing their devices in the U.S. The companies will have 10 days to submit their plan to withdraw these products from the market.

"In order for these mesh devices to stay on the market, we determined that we needed evidence that they worked better than surgery without the use of mesh to repair POP. That evidence was lacking in these premarket applications, and we couldn't assure women that these devices were safe and effective long term," said Jeffrey Shuren, M.D., director of the FDA's Center for Devices and Radiological Health. "Patient safety is our highest priority, and women must have access to safe medical devices that provide relief from symptoms and better management of their medical conditions. The FDA has committed to taking forceful new actions to enhance device safety and encourage innovations that lead to safer medical devices, so that patients have access to safe and effective medical devices and the information they need to make informed decisions about their care."

Surgical mesh has been used by surgeons since the 1950s to repair abdominal hernias. In the

1970s, gynecologists began implanting surgical mesh for abdominal repair of POP and, in the 1990s, for the transvaginal repair of POP. In 2002, the first mesh device for transvaginal repair of POP was cleared for use as a class II moderate-risk device. About 1 in 8 women has surgery to repair POP over her lifetime, and a subset of these surgeries are completed transvaginally with the use of surgical mesh. However, the percentage of women undergoing transvaginal POP mesh procedures has decreased in recent years after the FDA began issuing warnings (/medical-devices/implants-and-prosthetics/urogynecologic-surgical-mesh-implants) about the risks associated with using transvaginal mesh used for POP repair.

Two manufacturers have been marketing three surgical mesh products for transvaginal repair of POP. In reviewing the PMAs submitted by the two manufacturers, the agency determined they failed to provide an adequate assessment of the long-term safety of these devices and failed to demonstrate an acceptable long-term benefit of these devices compared to transvaginal surgical tissue repair without the use of mesh (native tissue repair). Since the FDA has not received sufficient evidence to assure that the probable benefits of these devices outweigh their probable risks, the agency has concluded that these products do not have a reasonable assurance of safety and effectiveness.

Boston Scientific filed two PMAs for its devices, the Uphold LITE Vaginal Support System and the Xenform Soft Tissue Repair System, and Coloplast filed a PMA for its device, Restorelle DirectFix Anterior. In February 2019, the FDA convened an advisory panel (/advisory-committees/advisory-committee-calendar/february-12-2019-obstetrics-and-gynecology-devices-panel-medical-devices-advisory-committee-meeting) to solicit input from experts on how to evaluate the safety and effectiveness of surgical mesh for transvaginal repair of POP. The panel recommended that to support a favorable benefit-risk profile, the effectiveness of surgical mesh for transvaginal repair of POP should be superior to native tissue repair at 36 months and the safety outcomes for surgical mesh for transvaginal repair of POP should be comparable to native tissue repair. The FDA agreed with these recommendations, and because such data were not provided by manufacturers in their PMAs, the FDA decided not to approve them. Even though these products can no longer be used in patients moving forward, Boston Scientific and Coloplast are required to continue follow-up of the subjects already enrolled in their 522 studies.

Women who have had transvaginal mesh placed for the surgical repair of POP should continue with their annual and other routine check-ups and follow-up care. There is no need to take additional action if they are satisfied with their surgery and are not having complications or symptoms. Patients should notify their health care professionals if they have complications or symptoms, including persistent vaginal bleeding or discharge, pelvic or groin pain or pain with sex. They should also let their health care professional know if they have surgical mesh, especially if they plan to have another surgery or other medical procedures. Women who were planning to have mesh placed transvaginally for the repair of

POP should discuss other treatment options with their doctors.

Over the past several years, the FDA has seen a significant increase in the number of reported adverse events associated with the use of surgical mesh for transvaginal POP repair. As a result, the agency has taken several, escalating actions for the protection of public health:

July 2011: FDA issued an FDA Safety Communication (/media/81123/download), which identified concerns and issued new recommendations about the use of surgical mesh for transvaginal repair of POP.

September 2011: FDA convened a public meeting of the Obstetrics and Gynecology Devices Panel (/advisory-committees/medical-devices-advisory-committee/obstetrics-and-gynecology-devices-panel) to discuss the benefits and risks of this use. Subsequently, the FDA issued 131 orders to conduct postmarket surveillance studies ("522 orders (/about-fda/page-not-found)") to 34 manufacturers of surgical mesh for transvaginal repair of POP. Most manufacturers elected to stop marketing surgical mesh for transvaginal repair of POP after receiving their 522 orders.

January 2016: The FDA completed its reclassification of surgical mesh (https://www.federalregister.gov/documents/2016/01/05/2015-33165/obstetrical-and-gynecological-devices-reclassification-of-surgical-mesh-for-transvaginal-pelvic) for transvaginal repair of POP into the highest risk class of devices (class III), which requires premarket approval (PMA) applications, the agency's most stringent device review pathway, in order to stay on the market.

July 5, 2018: This was the deadline for applications to be filed for premarket approval (https://www.federalregister.gov/documents/2016/01/05/2015-33163/effective-date-of-requirement-for-premarket-approval-for-surgical-mesh-for-transvaginal-pelvic-organ) for any surgical mesh marketed for transvaginal POP repair. Manufacturers that did not file PMAs by this deadline were required to withdraw their products from the market. Those that did were allowed to keep their products on the market while the FDA reviewed their PMAs.

February 12, 2019: The FDA convened an advisory committee meeting (/advisory-committees/advisory-committee-calendar/february-12-2019-obstetrics-and-gynecology-devices-panel-medical-devices-advisory-committee-meeting) to share the available evidence and seek expert opinion on how to evaluate the risks and benefits of these devices. The committee was asked to provide scientific and clinical input on assessing the effectiveness, safety, and benefit-risk of mesh placed transvaginally in the anterior vaginal compartment, as well as identifying the appropriate patient population and physician training needed for these devices.

The action today is part of the FDA's overarching commitment to advance women's health

and improve access to safe and effective medical devices. This includes the issuance of a Medical Device Safety Action Plan (/about-fda/cdrh-reports/medical-device-safety-action-plan-protecting-patients-promoting-public-health) and the agency's work to implement a new active surveillance system to quickly detect new device safety signals and efforts to strengthen Coordinated Registry Networks (CRNs), which link different real-world data sources to generate clinical evidence about medical products used by patients. In particular, the FDA is focusing on addressing clinical questions on device therapies that are unique to women, such as the treatment of uterine fibroids and pelvic floor disorders including POP. The FDA partnered with the American College of Obstetricians and Gynecologists, the American Urogynecologic Society, the National Library of Medicine and others on this effort, known as the Women's Health Technologies CRN, or WHT-CRN. Providing patients with access to the safest possible medical devices on the market to meet their health care needs remains a top FDA priority.

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

## Related Information

- Urogynecologic Surgical Mesh Implants (/medical-devices/implants-and-prosthetics/urogynecologic-surgical-mesh-implants)
- Reporting Problems with Mesh to the FDA (/medical-devices/urogynecologic-surgical-mesh-implants/urogynecologic-surgical-mesh-implants-reporting-problems-fda)

### ###

## Inquiries

**Media:**

✉ Deborah Kotz (mailto:deborah.kotz@fda.hhs.gov)

☎ 301-796-5349

**Consumer:**

☎ 888-INFO-FDA

# FDA's Activities: Urogynecologic Surgical Mesh

The FDA continues to take steps to support women's health and access to safe and effective medical devices. The FDA's efforts on urogynecologic surgical mesh have focused on identifying benefit-risk concerns related to some of these devices, and strengthening the FDA's regulatory oversight to protect patients, while enabling those who need these devices to benefit from them.

## FDA's Ongoing Efforts on Urogynecologic Surgical Mesh

- Reviewing and analyzing published literature, Medical Device Reports (adverse event reports), and postmarket information submitted to the FDA.

- Conducting epidemiological research on the safety and effectiveness of surgical mesh, as a part of our effort to better understand possible adverse events associated with surgical mesh for stress urinary incontinence (SUI) and pelvic organ prolapse (POP).

- Collaborating with professional societies and other stakeholders to fully understand the postmarket performance of urogynecologic surgical mesh devices, and the occurrence of and signs and symptoms associated with specific adverse events including low frequency but life-altering adverse events that may occur following repairs with surgical mesh.

### Summary of FDA Activities

**August 16, 2021: Final Results of the Boston Scientific Transvaginal Mesh for Pelvic Organ Prolapse (POP) 522 studies**

The Boston Scientific and Coloplast devices for transvaginal repair of pelvic organ prolapse are no longer commercially available. However, the FDA required the manufacturers to continue follow-up of the subjects already enrolled in their postmarket surveillance studies ("522 studies"), which looked at effectiveness and safety of transvaginal mesh for POP as compared to transvaginal native tissue repair (repairs without the use of mesh).

The two Boston Scientific 522 studies (https://www.accessdata.fda.gov/scripts/cdrh/cfdocs /cfPMA/pss.cfm) were completed, and the final reports (36-month follow-up data) were reviewed by the FDA. The study results showed that Boston Scientific transvaginal POP mesh had similar effectiveness and safety outcomes to native tissue repair at 36 months. The FDA continues to believe that devices of this type for transvaginal POP mesh repair presents potential additional risks compared to native tissue repair, including mesh exposure and erosion. Therefore, the FDA maintains that these devices do not have a favorable benefit-risk

profile.

The Coloplast 522 study final report is expected in February 2022.

### April 16, 2019: Order to Stop Selling and Distributing Products
After the reclassification of surgical mesh for transvaginal repair of pelvic organ prolapse into class III, the FDA began its review of two Premarket Approval Applications (PMA) from Boston Scientific for its devices, the Uphold LITE Vaginal Support System and the Xenform Soft Tissue Repair System, and a Premarket Approval Application from Coloplast for its device, Restorelle DirectFix Anterior.

The FDA decided not to approve these PMAs because the data submitted did not provide a reasonable assurance of safety and effectiveness. In particular, the data submitted were not consistent with the recommendations of the February 2019 advisory panel (see below). The FDA ordered the two manufacturers of the three mesh surgical products on the market for the transvaginal repair of pelvic organ prolapse to stop selling and distributing their products immediately. The companies subsequently withdrew their products from the market.

### February 12, 2019: Obstetrics and Gynecology Devices Panel Meeting
The FDA convened (https://www.fda.gov/advisory-committees/advisory-committee-calendar/february-12-2019-obstetrics-and-gynecology-devices-panel-medical-devices-advisory-committee-meeting#event-materials) an advisory committee meeting to solicit input from experts on how to evaluate the safety and effectiveness of surgical mesh for transvaginal repair of prolapse. The panel concluded that to support a favorable benefit/risk, surgical mesh for transvaginal repair of prolapse should be superior to native tissue repair at 36 months, and the safety outcomes for surgical mesh for transvaginal repair of prolapse should be comparable to native tissue repair.

### July 13, 2018: Order to Stop Selling and Distributing Products
The FDA ordered the manufacturer of the last mesh surgical products on the market for the transvaginal repair of pelvic organ prolapse in the posterior compartment (rectocele) to stop selling and distributing their products. The company withdrew their product from the market.

### January 5, 2016: Proposed Orders Finalized
The FDA finalized the proposed orders issued in 2014. As a result, the FDA reclassified (https://www.federalregister.gov/documents/2016/01/05/2015-33165/obstetrical-and-gynecological-devices-reclassification-of-surgical-mesh-for-transvaginal-pelvic) surgical mesh for transvaginal repair of pelvic organ prolapse into class III, which require premarket approval (PMA) applications, the agency's most stringent device review pathway. The FDA mandated (https://www.federalregister.gov/documents/2016/01/05/2015-33163/effective-

date-of-requirement-for-premarket-approval-for-surgical-mesh-for-transvaginal-pelvic-organ) that premarket approval applications be filed by July 5, 2018 for any surgical mesh marketed for transvaginal pelvic organ prolapse repair. As a result of the FDA's actions, all manufacturers ceased marketing of surgical mesh intended for transvaginal repair of posterior compartment prolapse (rectocele).

## April 29, 2014: Proposed Orders Issued

The FDA issued two proposed orders for surgical mesh for transvaginal pelvic organ prolapse (POP) repair that put forth changes to address the risks associated with these devices.

- One order proposed (https://www.federalregister.gov/documents/2014/05/01/2014-09907/reclassification-of-surgical-mesh-for-transvaginal-pelvic-organ-prolapse-repair-and-surgical) to reclassify surgical for transvaginal repair of POP from class II to III.

- The second order proposed to require PMA applications for these devices.

Once final, manufacturers will be required to provide clinical data in a premarket approval (PMA) application to support the safety and effectiveness of surgical mesh for transvaginal POP. Also, manufacturers of the tools specifically for implanting surgical mesh will be required to obtain premarket clearance (510(k)).

## March 27, 2013: Stress Urinary Incontinence (SUI) Updates on FDA.gov

The FDA updated the Urogynecologic Surgical Mesh Implant pages on FDA.gov to include more information for patients about stress urinary incontinence (SUI). This update provided the FDA's current thinking about the use of surgical mesh for repair of SUI and is based on an analysis of adverse events reported to the FDA, findings reported in the scientific literature and input received from the Sept. 9, 2011 meeting of the Obstetrics and Gynecology Devices Panel of the Medical Device Advisory Committee. Additionally, the FDA is following through on our commitment to inform the public about surgical mesh for stress urinary incontinence (SUI).

## January 3, 2012: Postmarket Surveillance Studies Ordered

The FDA ordered postmarket surveillance studies ("522 studies") by manufacturers of urogynecologic surgical mesh devices to address specific safety and effectiveness concerns related to mini-sling devices for SUI and surgical mesh used for transvaginal repair of POP. For information on the status of the 522 Postmarket Surveillance Studies and the FDA's authority to order 522 studies, see 522 Postmarket Surveillance Studies Program (/medical-devices/postmarket-requirements-devices/522-postmarket-surveillance-studies-program). As of February 17, 2013, the FDA issued:

- 95 postmarket study orders to 34 manufacturers of urogynecologic surgical mesh for

POP; and

- 14 postmarket study orders to seven manufacturers of mini-slings for SUI.

Data from the studies will enable the agency to better understand the safety and effectiveness profiles of these devices. For information on the status of the 522 Postmarket Surveillance Studies and the FDA's authority to order 522 studies, see 522 Postmarket Surveillance Studies - Frequently Asked Questions (FAQs).

## September 8-9, 2011: Obstetrics and Gynecology Devices Panel Meeting
the FDA convened the Obstetrics and Gynecology Devices Panel of the Medical Device Advisory Committee (the Panel) to discuss the safety and effectiveness of surgical mesh used to treat both SUI and POP.

- Based on the Panel's deliberations, assessment of Medical Device Reports (adverse event reports) submitted to the FDA, and evaluation of the published literature, the FDA is considering the recommendation that urogynecologic surgical mesh used for transvaginal repair of pelvic organ prolapse (POP) be reclassified from Class II (low- to moderate-risk devices) to Class III (high-risk devices).

- The Panel also recommended that surgical mesh for SUI and surgical mesh for abdominal repair of POP remain in Class II (low- to moderate-risk devices).

## July 13, 2011: Safety Communication and Analysis Issued
The FDA provided an updated communication about serious complications associated with transvaginal placement of surgical mesh used to treat POP. For details, see UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse (https://wayback.archive-it.org/7993/20170111231226/http:/www.fda.gov /MedicalDevices/Safety/AlertsandNotices/ucm262435.htm) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer).

The FDA also released an analysis titled Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse (/media/81123 /download) (PDF-252KB). The FDA previously communicated about serious complications associated with transvaginal placement of surgical mesh to treat pelvic organ prolapse (POP) and SUI in the October 20, 2008 FDA Public Health Notification: Serious Complications Associated with Transvaginal Placement of Surgical Mesh in Repair of Pelvic Organ Prolapse and Stress Urinary Incontinence (https://wayback.archive-it.org/7993/20170111190506 /http:/www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications /ucm061976.htm) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer).

The FDA will continue to provide information to the public as it becomes available.

# EXHIBIT "D"

## Letters of Character




# SPECIALISTS

### M D of Michigan, PLLC

September 14, 2021

Judge Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re: United States v. Wesley Barber**
**Case #: 1:19-cr-00239**

Dear Judge Dearie:

Wesley Barber has worked for me since late 2017. I am a Board Certified Neurosurgeon with over 40 years in practice. I am licensed in 5 states. I hired Mr. Barber in my Orlando practice to implement an electronic medical records system, marketing and promotion of the practice, and to help me analyze the collectability of my accounts receivables. Mr. Barber was recommended to me by several ambulatory surgery centers where I performed my surgical cases, and other colleagues in the area. The timing for me was perfect as I was looking to expand my practice into other states where I was licensed. Mr. Barber possessed the skills to open a new practice, implement structure and organization, secure business licenses, handling of human resources, finding me coverage from other neurosurgeons, assist me in the time consuming credentialling process with surgical facilities, and ensuring the facilities were equipped with the instruments I specifically use in my procedures.

Not only did Mr. Barber become an invaluable asset to my practice because of his tireless work ethic. I am and was aware of his indictment in New York. In fact, at the moment he learned of the indictment he was with me in Texas. We were there to look at office space to potentially open a new practice. I was the one who drove him to the Courthouse where he voluntarily turned himself in.

Over the days, weeks, months and now years since that day, I have watched his mental and physical health deteriorate. The stress of this matter resulted in his marriage failing, the loss of his family, his home, and all if not most of everything he once had. The expenses with defending himself have been overwhelming not only in this case but also the civil suits that have been filed against him. He has carried the burden of this case every day and it has weighed heavily on his heart. He has been diagnosed with high blood pressure and diabetes mellitus, both of which require monthly consultation, observation, prescription medications, and laboratory testing.

---




   With regard to Mr. Barber's character, he is a genuinely kind person.  He truly cares about people, and is willing to help however he can.  On surgery days, he would go to the surgery center and comfort patients families by providing updates on the surgeries I was performing. He always seems to go the extra mile and treats each of the patients as if they were an extension of his own family.

   From a medical perspective, I do not feel Mr. Barber is medically or emotionally stable for incarceration. While he made it through the Covid virus a few months back under my medical supervision and care, his condition is considered in the high risk category. Even if he were limited to a work then home type sentence, his medical conditions could be properly monitored and his emotional spirit would not be completely broken. I hope that you will consider my professional and personal opinions at the time of Mr. Barber's sentencing.

Stefan G. Pribil, MD
Board Certified Neurosurgeon

Ana C Mansilla
2666 Rosemont Cir
Davenport, FL  33837
407-698-2069

Judge Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re:  United States v. Wesley Barber
Case #:  1:19-cr-00239

Dear Judge Dearie:

I am the former wife of the defendant, Wesley Barber.  Our marriage failed in large part due to the tremendous stress involved with this case, and civil cases that have been filed against my ex-husband.  I am writing this letter in hopes that your honor will consider some leniency at the time of sentencing.  My ex-husband has been dealing with extreme depression and anxiety since the day of his arrest.

Mr. Barber is good man.  He is compassionate and giving.  In my case, he fully took care of my three young children from a prior marriage when the biological father abandoned us all with no support whatsoever. He loved and raised my children as his own.  Mr. Barber is the only father my children have known, and our divorce, loss of our home, and loss of our family have been very difficult both emotionally and physically on all of us.   This is one example of many extraordinary things he did to help people in need.

I am employed as a medical assistant, but due to the Covid pandemic have only been able to find part-time work that does not nearly produce enough money for us to survive.  Mr. Barber is the only financial support that I have in order to pay for a roof over our heads, transportation, and food.  Should  he be sentenced to jail, and unable to work, my children and I will be left without the ability to afford rent and expenses that he continues to help pay.

I cannot speak for the acts that his has been charged with because I don't understand all of them, but I can tell you that he helped a lot of women with a very bad product, who were desperate and in pain, find hope and helped them put their lives back together.

This entire process has been a lesson for everyone involved and it will be a lesson we will all have to live with for the rest of our lives. I ask and pray that you agree and consider a sentence outside of jail. Thank you for taking the time to review and consider my letter.

Sincerely,

Ana Cecilia Mansilla



**Pastor Phillip Short**
**Senior Minister**

**Dale Tedder, Jr.**
**Minister of Discipleship**

Judge Raymond J Dearie
United States District Court
Easter District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

September 9, 2021

RE: Case #1:19-cr-00239
United States v. Wesley Barber

Dear Judge Dearie,

Greetings. My name is Rev. Phillip Short. I am an ordained pastor in the Florida Annual Conference of the United Methodist Church. I am in my 34th year of ordained ministry, and I have known Wesley Barber for all of those 34 years. This is to say that I have known Wesley since he was a teenager. I have been his friend and pastor. I conducted his wedding ceremony. I conducted the funeral of both his father and mother. While life has taken him to the other side of the country, we have managed to stay in touch through the years. It would be fair to say that the two of us grew into adulthood alongside one-another. I saw Wesley Barber make than transition from high school graduate, to college student, to paralegal student, to legal worker, to businessman. He has done a great job of independently forging and finding his way in life. I have always been impressed with Wesley and his willingness to learn. We all known that one of the ways that we learn involves "trial and error," which is to say that we have learned by making mistakes. One of several ways that I have been impressed with Wesley Barber over the years is the candor by which he speaks of having learned life lesson, including the way he has candidly admitted to making mistakes. He has candidly "fessed up" to making them and candidly told me of how he has learned.

I have been uniquely positioned to be a friend and a pastor to Wesley Barber throughout these years. While there were long season where we did not live close enough to worship with each other, we have stayed in touch over the telephone. Our friendship has often led to "pastoral conversations." We had such pastoral conversations some while ago when he spoke of the accusations leveled against him; the case that is before you now. I was impressed with the way he acted in good faith. I was further impressed with the way that he admitted error and took responsibility. And would life him up as an example for the way he expressed remorse. And I would life him up as exemplary in his determination to avoid such errors in the future.

I share this with you to ask for leniency in his sentencing. I believe that Wesley Barber made mistakes. I believe he has owned up, learned, and resolved to be a better citizen with a deeper respect for the rules and regulations. With the exception of the afore mentioned infraction, for which he has owned and learned from, he has been a positive contribution to society. It is my sincere hope that you release him to continue on an upward trajectory.

Please contact me if you have any questions.


Respectfully,

Rev. Phillip Short

Mary Alava
547 Ringwood Ave.
Wanaque, NJ 07465
908-404-2387

Judge Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Wesley Barber
Case #: 1:19-cr-00239

Dear Judge Dearie:

My name is Mary Alava, and I worked for Mr. Barber's company for approximately two years. I am writing to you to share some points about Mr. Barber as a person. Mr. Barber treated me and his other employees like an extension of his own family. When I had transportation issues getting to work and caring for my children, Mr. Barber helped me find reliable and safe transportation. He helped on occasions with family emergencies, specifically following an earthquake in my home country of Ecuador where my mother resided.

He acted as a role model to my children and encouraged them to do good in school and to stay out of trouble. During the holidays, he provided everyone in the office with a complete meal to ensure that everyone could enjoy with their families. I view him as a giving man, and a great boss.

I have read the articles in the newspaper, and the charges against him. I cannot speak for all of the charges, but the ones suggesting he tricked or pressured women into a surgery are simply not true. The service that was provided was a second opinion option for women who were having severe complications related to their mesh. I was never asked or told to try and sell the women we spoke to on anything. In many cases, Mr. Barber fronted the travel expenses for the women. To ensure they had the proper emotional support, he also paid for a spouse or family member to travel and attend the appointments that were scheduled. Further, we never were instructed or asked to request any money from the women directly for any of the expenses associated with helping them get an opinion with regard to their condition.

In my opinion I do not believe Mr. Barber intended to do anything wrong or to commit a crime or crimes. While all of the records were destroyed when the company closed, I remember receiving letters in the mail everyday thanking us for the help we provided. This is my opinion, and only Mr. Barber can speak for his actions. With that said he is an intelligent man, and I am positive the consequences of this process have taught him a lesson.

I do not believe Mr. Barber deserves to go to jail. He is not a dangerous man, and I truly believe he will find ways to continue to help people and contribute to the overall good of society. Thank you for considering my letter in your decision.

Sincerely,

Mary Alava

Donya Berry
13530 Michigan Avenue, Suite 120
Dearborn, MI 48216

Judge Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re: United States v. Wesley Barber**
**Case #: 1:19-cr-00239**

Dear Judge Dearie:

My name is Donya Berry. I met the Defendant, Wesley Barber, when he interviewed me for an administrative position with Stefan Pribil, a Board Certified Nuerosurgeon. I was hired and have worked with Mr. Barber for almost three years.

During those three years I have witnessed his character. He is a good man that is motivational, generous, humble and fair. He is charitable and sincerely cares about people. I know he has helped me and my family, especially during the uncertain times of the pandemic in Michigan. While the medical clinic was closed, he helped me and the others workers find jobs so we could provide for our families.

As a mother of two small children I truly have appreciated the flexability and understanding he has given to me and my family as it pertains to my duties at home versus my duties at work. Family comes first. He has given our office a sense of stability and positive energy that makes everyone from the patients, to the workers, to the surgeon who owns the clinic want to be there. He truly is service to others first.

I personally watched Mr. Barber, and participated with him, on the front lines of the Covid pandemic in low income communities of Detroit providing supplies, testing events, and food for those less fortunate. He did not do this because he was ordered to, but because he wanted to.

Everyone in life makes mistakes. It is what the person does after making a mistake that truly defines who they are. I can honestly say that if Mr. Barber was not part of the practice and business where I work, it would have a negative impact not only to me and my family, but the other workers, and the patients our practice serves within the community.

By sentencing him to jail, it will have a negative impact on many lives. Please consider all of the lives that he touches in a positive way during his sentencing proceedings.

Sincerely,


Donya Berry

Victoria Barber
8105 Parshallville Road
Fenton, MI  48430
Phone:  (407)868-0467

Judge Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

**Re:  United States v. Wesley Barber**
**Case #:  1:19-cr-00239**

Dear Judge Dearie:

   My name is Victoria Barber, I am 22 years of age, and the daughter of the defendant, Wesley Blake Barber.  I am writing in hopes that you will consider a sentence that does not require my father to serve any jailtime.

   Prior to entering the plea agreement, my father sat with me and discussed the offer he has been presented and the potential outcomes of his admission.  My father has always been one to teach my brother and I to take accountability for the things we have done wrong, and to always tell the truth.

   My father had remained silent until he was formally charged with these criminal acts.  The actual acts surrounding the charges until now have only been discussed with his attorneys, and the Department of Justice in the form of a "proffer".  It is clear, my father admits to having received money from the co-defendant, Dr. Walker, in this case.  At the time I truly believe neither Dr. Walker nor my father had "intent" to defraud women associated with their medical problems from transvaginal mesh, and were unaware of the laws regarding "kick-backs".

   Unrecognized is how the financial assistance was used. Dr. Walker's company would receive money related to surgical services that his company or others provided. The  funding company only issued payment to Dr. Walker's company, and Dr. Walker was responsible for making payments to other providers involved in the care of the patient (ie:  surgical center, anesthesia provider, diagnostic companies, pathology).  In some cases, but not all, my father's company received money from Dr. Walker for reimbursement of patients' travel expenses (airfare, hotel accommodations, ground transportation, food, blood work, etc.).  My father's company not only paid for the actual patient, but also a family member or companion to travel and stay with the patient, so they were not alone.  Unaware of the "kick back" laws at the time, my father thought the reimbursement was legitimate.  He did not receive money on every case Dr. Walker treated.  At the advice of his attorneys, he was instructed to plead the 5th amendment.  In hindsight, I know my father would have rather just been forth coming.

   The weight of this situation has not been taken lightly. I have read and reexamined the charges placed against my father, and the media portrayals of him. Both of which are inaccurate depictions of his character and demeanor. The physical product that is subject of my father's case has been banned by the FDA, not only in the United States of America but also in other high class countries. Continually, for decades, the companies who sold these transvaginal mesh products were knowingly causing women pain and disfigurement while making  billions of

(page 2)
Re: United States v. Wesley Barber
Case #: 1:19-cr-00239

dollars doing so. The companies lied to the doctors who used the products to treat patients. My father was providing a medical concierge service for women who were unable to get answers as to what was wrong with them. There is a movie on Netflix called, "The Bleeding Edge", the documentary names Transvaginal mesh and depicts a better understanding of the disabilities this product has caused. Hundreds of thousands of women worldwide have suffered. Executives of the companies that manufactured these products admit they were aware that the products were not functional, and are harmful to women. Yet they chose to bury adverse cases being reported dating as far back as the 1990's. Based on posts I have read on numerous websites, I know that women will stand behind the medical care provided by Dr. Walker. I have attached a few articles for your review. The first article is from the Attorney General of New York announcing a multi-state settlement against the manufacturers of these products and how they deceived the public. The second article is from the FDA announcing a ban on transvaginal mesh products in the United States.

Although this matter has been extremely complicated and taxing on our entire family, my father has continued in his life of servitude for others. I personally have witnessed the countless charitable acts my father has done for the less fortunate, and how greatly he affected the lives of many in a positive way throughout his life. Despite living under the tremendous stress of being accused of serious crimes, my father sacrificed his health to help the lower income areas of Detroit, Michigan during the COVID19 pandemic. He not only organized a plethora of Covid testing events, but he also personally provided free PPE equipment, including facemasks, face shields, gloves, and hand sanitizer to those who could not regularly afford it. He like many others, suffered the subduing of the COVID19 virus, and was bedridden for at least three entire weeks. He knew the risks of helping others, yet he still performed.

Subsequentially, I genuinely hope that it is seen that my father does not need to go to jail. Our family has been emotionally, financially, and physically torn apart. If my father was to leave for a period of time, this would greatly affect him and our whole family negatively. His health has been tremendously decreasing over the levels of stress bestowed on him, between everything happening in the surrounding world, to what's happening in our current life, his blood pressure has skyrocketed. Lastly, lessons have been learned, and the punishment has been the process during the course of this case. My father lost his marriage, his house, his inheritance, his assets, and his physical and mental health. I pray that you show my family and my father some compassion at the time of sentencing. I know he can still contribute to the better good of society.

Thank you for your time and consideration.

Sincerely,

Victoria Barber