

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

<table>
<tr><td>EAG/SME/AJE</td><td>271 Cadman Plaza East</td></tr>
<tr><td>F. #2018R00272</td><td>Brooklyn, New York 11201</td></tr>
</table>

January 13, 2022

<u>By ECF</u>

The Honorable Raymond J. Dearie
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re: *United States v. Wesley Blake Barber, et al.*,
       <u>Criminal Docket No. 19-239 (S-1) (RJD)</u>

Dear Judge Dearie:

    On September 14, 2021, defendant Wesley Blake Barber pleaded guilty to Count Five of the Superseding Indictment, which charged him with Travel Act conspiracy in violation of 18 U.S.C. § 371 (Count Five). The defendant is currently scheduled to be sentenced on January 18, 2022.

    The government respectfully submits this letter to aid the Court in calculating the defendant's United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range and arriving at an appropriate sentence in this case and in response to the defendant's sentencing submission, filed on January 4, 2022. In light of the seriousness of this offense, the critical role that the defendant played at the center of the charged conspiracy, and the harms caused to multiple doctor-patient relationships corrupted by the defendant and his co-conspirators, the government respectfully submits that the defendant should be sentenced to a term of imprisonment and the non-incarceratory sentence sought by the defendant would not achieve the goals of sentencing as set forth in 18 U.S.C. § 3553(a).

I.  <u>Background</u>

    A.  <u>The Surgery Kickback Scheme</u>

    The defendant Wesley Blake Barber and others were engaged in a scheme that corrupted the doctor-patient relationship through bribes and kickbacks relating to surgeries in connection with multi-district litigation ("MDL") and other mass tort lawsuits about transvaginal mesh ("TVM") implants. Barber, a so-called funding facilitator, accepted bribes and kickbacks from doctors, including defendant Walker, in return for the referral of patients for TVM-removal

surgeries, in violation of Florida's commercial bribery statute, which prohibits patient brokering. See Fla. Stat. §§ 817.505 and 456.054. Barber's role was to connect patients with funding sources and doctors who would perform the TVM-removal surgeries. (December 13, 2021 Presentence Investigation Report ("PSR") ¶ 6).[1] Between approximately June 2013 and March 2016, the defendant made these arrangements in connection with his businesses Surgical Assistance Inc. and Medical Funding Consultants LLC. (PSR ¶ 6).

As reflected on its website, the United States Food and Drug Administration ("FDA") has never issued a recall as to TVM implants and never labeled them "defective" (although it identified the value of prospectively implanting TVM as lacking).[2] Notwithstanding its description of the prospective value of implanting TVM, the FDA has cautioned that there are risks associated with removal of TVM inserts and has not advocated for removal of TVM implants. A July 2011 release by the FDA explained: "Removal of mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible and may not result in complete resolution of complications, including pain." FDA, Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse (July 2011), available at https://www.fda.gov/media/81123/download (last visited Jan. 7, 2022).

Since approximately 2008, manufacturers of TVM implants were engaged in lawsuits relating to the use of TVM implants and the alleged harm that these implants caused. (PSR ¶ 8). In 2012, a multi-district litigation ("MDL") was formed and numerous TVM lawsuits were consolidated. (PSR ¶ 8). In June 2013, one manufacturer-defendant in the MDL announced it had entered into a Master Settlement Agreement ("MSA"). (PSR ¶ 8). The MSA set, among other things, the monetary recoveries to be provided to women based on the particular category they fell into. (PSR ¶ 8). Specifically, women who underwent surgeries to remove the TVM implants were entitled to receive a larger settlement than those whose TVM remained implanted (i.e., was not surgically removed). (PSR ¶ 8). Other manufacturers entered into similar, publicly announced settlement agreements. (PSR ¶ 8).

Following the June 2013 announcement of the MSA, Barber and others participated in a scheme to profit from the terms of the MSA by arranging for and performing TVM-removal surgeries in connection with lawsuits against various TVM manufacturers. (PSR ¶ 9). For example, recognizing the opportunity to profit in connection with the litigation,

---

[1] Defendant Barber and the government separately provided objections and supplemental information to the Probation Department in connection with the PSR.

[2] In an April 16, 2019 release, the FDA announced that remaining manufacturers were to stop selling TVM implants. https://www.fda.gov/news-events/press-announcements/fda-takes-action-protect-womens-health-orders-manufacturers-surgical-mesh-intended-transvaginal (last visited Jan. 7, 2022). The release noted in part: "Women who have had transvaginal mesh placed for the surgical repair of POP [pelvic organ prolapse] should continue with their annual and other routine check-ups and follow-up care. There is no need to take additional action if they are satisfied with their surgery and are not having complications or symptoms."

Barber's company Medical Funding Consultants LLC included in an investor presentation the following information concerning potential plaintiffs who underwent TVM-removal surgeries:

> In the case of [one manufacturer], they agreed to settle 20,000 cases for $830 million dollars. That is a case average of $41,500 per case. What is not published in that settlement announcement is how the monies are allocated. In order for the law firm to secure the $830 million they are required to secure general releases from 95% of their clients. Approximately 85 percent of the law firm cases in this settlement are non-surgical, meaning 17,000 women did not have surgical care. There is a clear and distinctive value difference between a non-surgical and surgical case (as evidenced by the jury verdicts and awards being published). The women who **did not** have surgery can expect to receive a settlement in the range of $15,000.00 using up $255 million of the $830 million. This leaves $575 million to compensate the women who underwent extensive surgery to remove the mesh product. The monies reserved to resolve the surgical cases will average $230,000.00 per case. It has been projected through law firms which we work with that surgical cases will be resolved in a global settlement ranging between $160,000 to $300,000 depending on the clients out of pocket expenses and damages."

(Exhibit A: AMS_MESH_DOJ_00062971 at 62985).

The scheme to profit from the anticipated settlements connected to mesh removal surgeries generally proceeded in four steps.

First, members of the conspiracy facilitated the identification of women throughout the United States who had TVM implanted and might have been willing to undergo removal surgeries and commence lawsuits against the manufacturers (the "Victims"). (PSR ¶ 10). Individuals who worked for Barber and his companies Surgical Assistance and Medical Funding Consultants LLC contacted these women to determine if they would travel to meet with a pre-selected surgeon and undergo removal surgeries. (PSR ¶ 10). Jane Doe #1, Jane Doe #2 and Jane Doe #3 were three of these women. (PSR ¶ 10). To induce the Victims to undergo the removal surgeries, thereby leading to a higher settlement payment, scheme participants falsely and fraudulently (i) described the risks of the TVM implants and the need for removal of those implants, (ii) strongly implied that they would need to travel out-of-state to use pre-selected doctors (such as co-defendant Walker) rather than their local doctors, and (iii) misled the Victims about their ability or inability to rely on their health insurance to cover medical expenses. (PSR ¶ 10). For example, Jane Doe #1 reported that she received a telephone call informing her that the mesh implant she had was the subject of a recall and that it would cause her cancer. The women were not told that the pre-selected surgeons were paying bribes and kickbacks in exchange for referrals to those surgeons. (January 11, 2022 Presentence Investigation Report Addendum ("PSR Add.") ¶ 10).

Second, various companies, including Funding Company-1 and Funding Company-2, financed the removal surgeries. (PSR ¶ 11). These companies generally financed

these surgeries either by (a) offering loans secured by financial awards form personal injury lawsuits ("Contingent Loans") or (b) by purchasing the right to collect debts for expenses owed by patients who had removal surgeries ("Medical Debts"). (PSR ¶¶ 7, 11). Some of these agreements included provisions in which the women agreed to repay the costs of the removal surgery plus interest, which accrued at exorbitant rates, if the women ultimately received a settlement or favorable judgment against the mesh manufacturer. (PSR ¶ 11). For example, Jane Doe #3 received $22,000 in funding for her surgery; this loan compounded interest monthly at an annual percentage rate of 38.40% (Exhibit B, LAW000030716). By the terms of the agreement, for this loan to be repaid in June 2017, the amount due would be $70,619.05, if she ultimately received a settlement or favorable judgment. By the terms of the agreement, the interest continued to accrue. In other instances, the Victims were responsible for the medical bills associated with the removal surgeries even if they did not receive a settlement. (PSR ¶ 11). For example, Jane Doe #1 was financially responsible for $71,450 in outstanding medical charges for the TVM-removal surgery Walker performed. (Exhibit C, BAN000000263). Jane Doe #1's Medical Debt was then sold to Barber's company Medical Funding Consultants for $17,148 and that same day it was resold to Funding Company-2 for $32,152.50. Similarly, Jane Doe #2 incurred Medical Debt for her TVM-removal surgery in the amount of $86,162.00 was sold to Barber's company Medical Funding Consultants on May 30, 2014 for $24,125.36 and then resold that same day to Funding Company-2 for $38,772.90. (Exhibit G, BAN000005358). Jane Doe #1 and Jane Doe #3 both reported to the government that they had insurance at the time of their surgeries. (PSR Add. ¶ 10).

Notably, Barber sought Walker's assistance not simply for performing the mesh removal surgeries, but also to attempt to ensure that Victims signed the necessary litigation funding contracts. For example, on March 12, 2014, Barber e-mailed Walker: "Client will not sign for us. I need to you [sic] **lean on her to sign the contract**. Please get her to sign and notarize it so I can get you paid," then e-mailed Walker later that day regarding another patient: "Same problem. This client does not want to sign the funding contract. Bring her into the office and **make her sign it so you can get paid**." (Exhibit D, EDNY-TVM-000240064; EDNY-TVM-000246384) (emphases added).[3]

Third, once surgical funding was secured, the Victims were contacted again and arrangements were made for them to travel to visit a doctor who would perform the removal surgery (often by traveling hundreds of miles with very little consultation in advance of the surgery). For example, co-defendant Walker performed removal surgeries on Jane Doe #1 and Jane Doe #3 (PSR ¶ 12), who traveled from the Eastern District of New York to Florida to undergo the surgeries. These women generally consulted with the surgeons, including Walker, briefly before the surgery. (See PSR Add. ¶ 10).

Fourth, with no disclosure to the Victims who underwent these surgeries, Barber accepted bribes and kickbacks from Walker and others in exchange for the patient referrals. (PSR ¶ 13). These kickbacks were typically characterized as purported "marketing fees," were paid on a per-patient basis and often exceeded expenses actually incurred by Barber's entities.

---

[3] The referenced individuals appeared not to have ultimately entered the financial agreements.

(PSR ¶ 13). For example, shortly after Walker performed the mesh removal surgery on Jane Doe #3, Walker's company MedSurg issued a $16,000 check to Barber's company Surgical Assistance, representing kickbacks for four women, including Jane Doe #3, as reflected in the memo line. (Exhibit E).

The stream of patients brokered through bribes and kickbacks was lucrative. As Walker wrote to Barber on April 28, 2015: "Thanks for the cases. . . . We will continue to make sure whatever referrals you send us **are made a priority**." (Exhibit F) (EDNY-TVM-000203916) (emphasis added). Barber's companies received approximately $855,500 in bribe and kickback payments from medical providers and profited by approximately $1.3 million through purchasing and reselling medical debt for the surgeries.

B.   Victims' Accounts

Individual victims described in civil depositions and interviews with the Federal Bureau of Investigation how they were enticed into the scheme and how it affected them.

Jane Doe #1 received soliciting phone calls from people who had personal information about her. (PSR Add. ¶ 10). During these calls, the callers gave her the brand of her TVM implant and told her that her implant was being recalled and it would cause her cancer if she did not have it removed. (PSR Add. ¶ 10). Jane Doe #1 stated that when she asked the callers how they had obtained her personal information, she was told that the information was public and that a list of people who had TVM implants was available. (PSR Add. ¶ 10). The callers also told her she would be put in contact with a law firm, and that "they would take care of everything." (PSR Add. ¶ 10). Jane Doe #1 advised that after the initial calls, she spoke with an individual who she believed was a lawyer that had a "link" with the law firm. (PSR Add. ¶ 10). This individual talked to her about engaging in litigation against the manufacturer of her TVM implant. (PSR Add. ¶ 10). The caller had information about the doctor that performed her original TVM implant surgery, the place and date of her implant surgery, the last four numbers of her social security number, and her last name through marriage. Jane Doe #1 believed the law firm made the arrangements for her surgery in Florida. (PSR Add. ¶ 10). When she asked the law firm why the surgery had to be performed in Florida, she was told that their headquarter offices were in Florida and, since it was "cheaper" there and "they were paying for everything," that was the only option for the location of the surgery. (PSR Add. ¶ 10). Jane Doe #1 had health insurance at the time of the explant surgery, but she did not use it to pay for any costs associated to the surgery. (PSR Add. ¶ 10). Barber's company, Surgical Assistance, coordinated the TVM removal surgery with the Florida clinic. (PSR Add. ¶ 10). Records reflect that Walker performed Jane Doe #1's removal surgery on or about May 24, 2014. (PSR Add. ¶ 10). Jane Doe #1 informed the government that none of her New York doctors told her that the explant surgery was necessary. (PSR Add. ¶ 10). Jane Doe #1 did not see or have contact with Walker until the day of her surgery; when she saw him for the first time, she was already in the bed ready for surgery. (PSR Add. ¶ 10). Jane Doe #1 reported that she left the clinic the same day as her surgery and a nurse followed up with her at her hotel the day after her surgery. (PSR Add. ¶ 10).

Jane Doe #2 had a TVM implanted in March 2007 and she first started experiencing problems with her implant in 2008. (PSR Add. ¶ 10). She learned from treating doctors that she had developed scar tissue and adhesions that may have been caused by the

implant surgery.  (PSR Add. ¶ 10).  Jane Doe #2 was contacted by a law firm who advised her that they were well aware of her "bad implant" and that she needed to get it removed.  (PSR Add. ¶ 10).  Between 2013 and 2014, she decided to have her TVM explanted despite the fact that no doctor had recommended an explant.  (PSR Add. ¶ 10).  Jane Doe #2 contacted an attorney after seeing an ad on television, and the lawyer recommended "three to four" doctors to perform the explant surgeries.  (PSR Add. ¶ 10).  According to her deposition, from among those doctors, she ultimately chose one who was based in Florida, and she had a TVM-removal surgery in Florida on May 29, 2014.  (PSR Add. ¶ 10).[4]  Following the surgery, Jane Doe #2's incontinence returned and at the recommendation of a urologist based in New York, she had a new implant implanted in February 2015.  (PSR Add. ¶ 10).  Jane Doe #2 testified that she did not pay for the TVM-removal surgery and did not know who was paying for it, but she understood that she was ultimately legally responsible for the bills.  (PSR Add. ¶ 10).  Jane Doe #2 had health insurance at the time that she received the explant surgery.  (PSR Add. ¶ 10).

　　　　Jane Doe #3 had a TVM implanted in January 2012.  (PSR Add. ¶ 10).  On September 18, 2014, Walker performed the explant surgery under general anesthesia on Jane Doe #3 in Florida.  (PSR Add. ¶ 10).  Jane Doe #3 reported to the government that she had received a call, advising her that her implant was defective.  (PSR Add. ¶ 10).  Jane Doe #3 understood that in order to proceed with litigation against the mesh manufacturer, she needed to have the implant surgically removed.  (PSR Add. ¶ 10).  She testified in connection with the litigation that she did not recall how she learned about Walker, but that the woman who assisted her with travel arrangements likely "helped [her] set up an appointment with [Dr. Walker]." (PSR Add. ¶ 10).  However, in an interview with an FBI agent, she explained that her lawyer "gave" her Dr. Walker.  (PSR Add. ¶ 10).  Prior to flying to Florida, no one had physically examined her and told her the TVM implant needed to be removed, and other than Walker, no doctor told her the TVM needed to be removed.  (PSR Add. ¶ 10).  She did not believe she spoke with anyone other than her lawyer (and the woman who made the travel arrangements) about the explant.  (PSR Add. ¶ 10).  Finally, no doctor other than Walker ever told her that her problems were caused by her TVM.  (PSR Add. ¶ 10).  Jane Doe #3 also informed the government that when she arrived in Florida for the surgery, the first anesthesiologist refused to provide the anesthesia due to her obesity; Walker arranged for her to be transferred to a second outpatient clinic the following day in order to proceed with the surgery.  (PSR Add. ¶ 10).  She spent only three days in Florida.  (PSR Add. ¶ 10).  Jane Doe #3 testified that she provided Walker's office with her insurance card and assumed that the costs were covered by insurance.  (PSR Add. ¶ 10).  She testified that she did not believe she received a loan for her travel and did not believe she was subject to interest payments, but did eventually recall Funding Company-1 and stated that she understood that she would have to repay the company if she won her lawsuit.  (PSR Add. ¶ 10).

---

[4] Jane Doe #2's removal surgery was not performed by co-defendant Walker.

## II.    The Defendant's Guidelines Range

The Presentence Investigation Report calculated the defendant's Guidelines range at a level 21, as follows:

| | |
|---|---:|
| Base Offense Level: 8 (§2B4.1(a)) | 8 |
| Plus: Loss above $1,500,000 (§2B1.1(b)(1)(I)) | +16 |
| Subtotal: | <u>24</u> |
| Minus: Acceptance of responsibility | <u>-3</u> |
| Total: | 21 |

(PSR ¶¶ 24-33).

The resulting Guidelines level of 21 in the PSR calls for a sentence in the range of 37 to 46 months' imprisonment. The Probation Department has recommended a sentence of 37 months' imprisonment and an order of restitution in the amount of $5,200 to Jane Doe #1 and $86,000 to Jane Doe #4. (PSR ¶ 81; PSR Add. ¶ 19).

The government agrees with the calculation set forth in the PSR with the exception that it respectfully submits that a victim-related adjustment is appropriate. (In the plea agreement, the defendant stipulated to its applicability here.) Pursuant to U.S.S.G. § 3A.1.1(b)(1), a two-level enhancement is warranted "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim . . . ." A "vulnerable victim" is one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, Application Note 2; see also id. ("The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim."). "The vulnerability of the victim 'must bear some nexus to the criminal conduct,' and 'the defendant generally must have singled out the vulnerable victims from a larger class of potential victims.'" United States v. Getto, 586 F. App'x 11, 13 (2d Cir. 2014) (quoting United States v. McCall, 174 F.3d 47, 50 (2d Cir. 1998)). Here, the scheme participants identified women who had previously received TVM implants and conveyed to them that there were grave health implications associated with their continued use of these implants. Even before the scheme participants provided the women with this information, the women qualified as "vulnerable victims" given that the implant was designed to address a highly personal aspects of their lives, including incontinence and sexual intimacy. But once they were told about these potentially dire consequences, the women were even more vulnerable and the scheme exploited that vulnerability. Accordingly, the government respectfully submits that an enhancement of two levels pursuant to § 3A1.1(b)(1) is appropriate, resulting in a total adjusted offense level of 23, yielding an advisory sentencing range of 46 to 57 months' imprisonment.

## III.    A Sentence of Incarceration Is Appropriate

### A.    Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light

of other statutory concerns.  543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the circuit court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  Id. at 113.

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall, 552 U.S. at 49 (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the Court] may not presume that the Guidelines range is reasonable.  [The Court] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

B.     Application of Law

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant.  Factors pertinent to the instant offenses are discussed below.

1.     The Nature and Circumstances of the Offenses and the History and Characteristics of the Defendant

The defendant's conspiracy to violate the Travel Act is a serious crime.  The defendant participated in a years-long scheme that both corrupted the physician-patient relationship when the patients were looking for help with some of the most personal and private aspects of their lives and subjected the patients to significant financial obligations.  The scheme depended on the defendant referring patients to physicians who were both willing to perform the surgeries and pay the defendant thousands of dollars in kickbacks for each referral.  And for the scheme to succeed and profit to the extent it did, the defendant had to ensure that the women entered funding arrangements instead of using their own insurance.  The defendant made those referrals and accepted those kickbacks, repeatedly, for his own gain.

Paying bribes and kickbacks is hardly a harmless crime and by its nature calls into great question the quality of medical care provided by physicians.  The defendant claims that he did not attend the medical evaluations or influence the decision of the surgeon to perform the removal. (Def. Mem. 4).  However, by connecting the doctors and the litigation funding sources, the defendant knew that these doctors would be paid only if they actually performed the surgeries and therefore had a significant incentive to carry out the surgeries.  Moreover, infecting the doctor-patient relationship with bribes created perverse incentives for the doctors to carry out the removal surgeries rather than provide unconflicted patient care.  Additionally, when a patient broker or recruiter like Barber creates a model that leads a doctor to depend on him as a source

of patient volume, and therefore profit, concerns about maintaining the steady flow of patients may affect the independent judgment and trust of the doctor. Indeed, Barber was keenly aware of the value of his patient referrals. In expressing his gratitude to Barber for the referrals, Walker promised to give Barber priority treatment: "Thanks for the cases. . . . We will continue to make sure whatever referrals you send us are made a priority." (Exhibit F) (EDNY-TVM-000203916).

In addition to corrupting the doctor-patient relationship, the defendant also played a critical role in burdening the patients with contingent loans or medical debts. Contrary to the defendant's assertion, the contracts were not "strictly between the clients and the funding companies . . . ." (See Def. Mem. 5). For example, Barber sought to enlist his co-defendant Walker in ensuring that patients signed their funding agreements, writing: "Client will not sign for us. I need to you [sic] **lean on her to sign the contract**. Please get her to sign and notarize it so I can get you paid," then e-mailed Walker later that day regarding another patient: "Same problem. This client does not want to sign the funding contract. Bring her into the office and **make her sign it so you can get paid**." (Exhibit D, EDNY-TVM-000240064; EDNY-TVM-000246384) (emphases added).

Regardless of whether the doctors performing the surgeries were qualified or whether removal surgeries were medically warranted, the scheme caused concrete harm to the defendant's victims. First, the women who underwent removal surgeries were forced to travel long distances and stay in hotels immediately following their surgeries, despite the fact that there were doctors in their own hometowns who could have conducted the surgeries. Second, to pay for these surgeries, the women took out advances on any future legal settlements, rather than rely upon the health insurance they had, and many will as a result essentially receive no financial settlement as a result of their lawsuits. Third, the defendant's victims were not informed about the kickbacks paid by their surgeon to the defendant, depriving them of valuable information that might have influenced their decision to undergo such a significant and personal healthcare procedure.

Furthermore, nothing about the defendant's history or personal circumstances distinguishes him from most perpetrators of a significant financial crime. Simply put, this was not a crime of need. Nor was it crime resulting from events thrust upon him by outside forces. To the contrary, it was a calculated crime of choice. By the defendant's own assessment, he had valuable experiences in the legal and medical communities. (Def. Mem. 4). But instead of making money honestly, the defendant decided to participate in a large-scale scheme to sell patient referrals to physicians so they could perform invasive surgeries on women.

The defendant's health circumstances also do not warrant a non-incarceratory sentence. While the defendant may be at an increased risk of complications from COVID-19, including as a result of his diabetes and high blood pressure (Def. Mem. at 8), the government respectfully submits that these conditions, by themselves, do not support a sentence of home confinement or other non-incarceratory sentence.

2.    The Need to Promote Respect for the Law, Afford Adequate Deterrence, and to Protect the Public from Further Crimes of the Defendant

The defendant's decision to continue the scheme for years shows a lack of respect for the law; it also shows that he believed that he could continue to sell patient referrals without any fear of getting caught. These considerations weigh in favor of a sentence of imprisonment that reflects the seriousness of the defendant's decision to corrupt the trust of the doctor-patient relationship.

The need for general deterrence also weighs heavily in favor of a lengthy jail term. 18 U.S.C. §§ 3553(a)(2)(B) and (c). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime can therefore be affected and reduced with serious punishment." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006). Kickbacks in health care can be complicated crimes involving difficult questions at the interstices of the medical and legal professions. For these and other reasons, the likelihood of detection is relatively low. See Diane E. Hoffmann, Physicians Who Break the Law, 53 St. Louis U.L.J. 1049, 1052 (2009) (pointing to empirical research showing that professionals believe the probability of getting caught committing a white-collar crime is low and that fraud is "relatively easy to hide and hard to detect" because the acts involved "tend to be made up of complex, sophisticated, and relatively technical actions" that are "intermingled with legitimate behavior") (internal quotations and citations omitted)). As a result, in the circumstances presented by the crime of kickbacks, effective general deterrence requires strong penalties for those who are caught. This is especially true when the potential rewards for would-be criminals who are not caught can be substantial and when the deceptive steps taken by individuals, like the defendant, makes such crimes difficult to detect and successfully prosecute.

In sum, the defendant's punishment should take into account not only the scope and seriousness of his criminal conduct, as described herein, but also the need to deter future criminals from buying and selling patients in violation of state law.

IV.    Restitution and Forfeiture

Under 18 U.S.C. § 3663A, the Court shall impose restitution. In United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted).

Here, the defendant participated in a wide-ranging scheme where patients incurred significant debt from litigation funding companies in order to undergo TVM-removal surgery, as opposed to relying on doctors covered by their own health insurance. Because of the funding arrangements, the patients either subjected themselves to contingent loans with interest compounding at exorbitant rates, or incurred significant medical debts. These debts and obligations bear no obvious relationship to the actual services performed by the surgeons, but instead were a way to obtain for the scheme participants as much as possible from anticipated

settlements while saddling these women with serious financial obligations. By way of illustration, Funding Company-1 typically paid doctors approximately $20,000 to $22,000 to perform the removal surgeries, including for Jane Doe #3. But when Jane Doe #1 was charged for a removal surgery where her medical debt would eventually be resold to Funding Company-2, the surgeon's services were charged for over $70,000. Moreover, these charges also included the illegal kickbacks themselves (often $4,000 per patient), an amount that was passed along to the patients; at minimum, such an inflation should be recoverable as restitution.

In addition, the defendant acknowledged in the plea agreement that he obtained and acquired property that is subject to forfeiture and consented to the entry of a forfeiture money judgment in the amount of $1,106,986.44.

V.      Conclusion

For the foregoing reasons, and based on a balancing of the Section 3553(a) factors, the Court should impose a sentence of imprisonment, as well as order the defendant to pay restitution in the amount of $5,200 to Jane Doe #1 and $86,000 to Jane Doe #4 and a forfeiture money judgment in the amount of $1,106,986.44.

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

By:      /s/
        Elizabeth Geddes
        Sarah Evans
        Assistant U.S. Attorneys
        Eastern District of New York

JOSEPH S. BEEMSTERBOER
Acting Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By:      /s/
        Andrew Estes
        Trial Attorney
        Criminal Division, Fraud Section
        U.S. Department of Justice

cc:     Mark Nejame, Esq.
        Trey Flynn, Esq.
        Probation Officer Jaime Turton